*Sayler & Sayler,* for defendant.

---

### WALLACE BURCH v. GEORGE B. HARTE (CLERK).

1. An indorser of a promissory note who, as collateral security therefor, secured from the maker an assignment of his *unearned* referee fees to the holder, thereby incidentally securing against his own liability as indorser, is not, under the Ohio code of civil procedure, a "party in interest" in a contest between a subsequent assignee of the *earned* fees and the holder of the note, both of whom are claiming by virtue of their respective assignments from the referee.

2. Referees appointed by courts of record, under the code of civil procedure of Ohio, are "public officers," and as such become adjuncts to the judicial system of the state, clothed with some of the powers and duties of the judicial office. The object of their appointment is to relieve the courts of detail work, thereby contributing to the due and speedy administration of justice.

3. A referee's fee is not earned until a finding of facts has been made and the law applicable thereto decided by him, which duties constitute the chief functions of his office; and no compensation, separate and apart from the final completion, is provided for the preliminary labor, however onerous, which may be required to enable him to fully discharge such functions. Until final completion, an inchoate right to compensation, only, exists, which can not be the subject of assignment.

4. An assignment of unearned fees by a referee, who is a public

officer, is against public policy, and void; but an assignment of earned fees may be sustained.

5. A preëxisting debt will not support an assignment of fees as collateral security therefor as against a subsequent *bona fide* assignee for value without notice. The equitable maxim "first in time, first in right," is applicable only where equities are equal.

HOSEA, J.

The essential facts of the controversy are as follows:

The plaintiff claims the sum of $500 out of a sum of $1,000, in the hands of Harte, Clerk of the Court of Common Pleas of Hamilton County, by virtue of his office, being fees allowed the late Philip Kumler for services as referee in a certain suit. The claim is based on an assignment, in writing, from said Kumler, dated September 28, 1899, and filed with said clerk.

Upon motion of the clerk an order of interpleader was duly entered, and Scott Bonham and C. D. Robertson, made defendants, have filed answers and cross-petitions, both the latter standing upon an assignment from Kumler to Bonham executed August 30, 1898, and notice thereof given the said clerk on October 17, 1898.

The connection of Robertson with the matter is only indirect and incidental. He is indorser upon a note given by Kumler to Bonham in 1893, and procured the assignment by Kumler to Bonham in 1898 as collateral to said note in relief against his own liability as endorser. This does not make him a "party in interest" under the code. Bonham's answer and cross-petition in his own behalf covers all legal interest in this regard; consequently Robertson may be dismissed as an unnecessary party to the action.

It further appears, that at the date of the Bonham assignment in 1898, a number of hearings had been had by the referee, but no report had been made by him, and no allowance of fees had been made by the court.

The first allowance for services rendered was made and entered by the court on July 24, 1899, for the sum of $500;

and on September 28, 1899, Kumler assigned said allowed sum (or, as he expressed it, his "judgment for costs, amounting to $500") to the plaintiff, Burch, for a consideration of $450, cash paid to him therefor, which assignment is the predicate of this action.

Considerations of an equitable nature were touched upon in the very able arguments of counsel; but these must abide the determination of the main question involving the validity of the Bonham assignment.

The plaintiff contends that under the rule long established in England, and by many authorities in this country, the assignment by a public officer of his unearned compensation as such, is void as against public policy.

It is urged by defendant, (1) that this rule is not recognized in Ohio; and (2) that if it were, it has no application to a "referee" under our law.

The main doctrine, holding such assignments invalid, has long been the law of England. In *Hill* v. *Paul*, 8 Clark & Fin., 307, Lord Chancellor Lyndhurst quotes, as showing the law at a much earlier date, a terse expression of Lord Eldon, namely:

"A pension for past services may be alienated; but a pension for supporting the grantee in future services is inalienable."

In *Liverpool* v. *Wright*, 28 L. J. Ch. (N. S.), 871 (1859), Wood, vice-chancellor, discussing the reasons on which the doctrine rests, says:

"There is a second ground of public policy, for which the case of *Palmer* v. *Vaughan*, 3 Swanst., 173, is the leading authority, which is this: That nobody can deal with the fees of a person who holds an office of this description (clerk of the peace), because the law presumes, with reference to an office of trust, that he requires the payment which the law has assigned to him, for the purpose of upholding the dignity and performing properly the duties of that office, and, therefore, it will not allow him to part with any portion of those fees, either to the appointer

or to anybody else. He is not allowed to charge or in-
cumber them. * * * Any attempt to assign any portion of
the fees of his office is illegal on the ground of public poli-
cy, and held therefore to be void."

Many other English cases, both earlier and later, reiterate
the same doctrine without dissent.

In this country the case of *Bliss* v. *Lawrence,* 58 N. Y.,
442 (17 Am. Rep., 273—1874), is generally regarded as
the leading one. It arose upon an assignment by a clerk in
the United States treasury department of a month's salary
in advance.

The court says:

"The controlling question in these cases is that of the
lawfulness of an assignment, by way of anticipation, of
the salary to become due to a public officer. * * *

"Salaries are, by law, payable after work is performed
and not before, and, while this remains the law, it must
be presumed to be a wise regulation, and necessary, in
the view of the lawmakers, to the efficiency of the public
service. The contrary rule would permit the public service
to be undermined by the assignment to strangers of all
the funds appropriated to salaries. It is true that, in re-
spect to officers removable at will, this evil could in some
measure be limited by their removal when they were found
assigning their salaries; but this is only a partial remedy,
for there would still be no means of preventing the con-
tinued recurrence of the same difficulty. If such assign-
ments are allowed, then the assignees, by notice to the
government, would, on ordinary principles, be entitled to
receive pay directly and to take the places of their assignors
in respect to the emoluments, leaving the duties as a barren
charge to be borne by the assignors. It does not need much
reflection or observation to understand that such a condi-
tion of things could not fail to produce results disastrous
to the efficiency of the public service."

The court discusses the English authorities, and con-
tinues:

"Similar questions have arisen in respect to persons not strictly public officers, but the principle before stated has, in the courts of England, been adhered to firmly. * * *

"The substance of it all is, the necessity of maintaining the efficiency of the public service by seeing to it that the public salaries really go to those who perform the public service. To this extent, we think, the public policy of every country must go to secure the end in view."

The general rule thus indicated has been followed and adopted in many states in a number of cases, of which the following are examples: *Schloss* v. *Hewlett*, 81 Ala., 266 (1 So. Rep., 263, 266) ; *King* v. *Hawkins* (Ariz.) ; *Bangs* v. *Dunn*, 66 Cal., 72 (4 Pac. Rep., 963) ; *Ellis* v. *State*, 4 Ind., 1 ; *Holt* v. *Thurman*, 23 Ky. Law, 92 (63 S. W. Rep., 280) ; *State* v. *Williamson*, 118 Mo., 146 (23 S. W. Rep., 1054 ; 21 L. R. A., 827 ; 40 Am. St. Rep., 358) ; *King's Estate, In re,* 110 Mich., 203 (68 N. W. Rep., 154) ; *Wayne Tp.* v. *Cahill*, 49 N. J. Law, 144 (6 Atl. Rep., 621) ; *Worthington, In re,* 141 N. Y., 9 (35 N. E. Rep., 929 ; 23 L. R. A., 97) ; *Elwyn's Appeal,* 67 Pa. St., 367 ; *Buttz* v. *Charleston Co.,* 17 S. C., 585 ; *State* v. *Barnes,* 10 S. Dak., 306 (73 N. W. Rep., 80) ; *National Bank* v. *Fink,* 86 Tex., 303 (24 S. W. Rep., 256 ; 40 Am. St. Rep., 833) ; *Stevenson* v. *Kyle,* 42 W. Va., 229 (24 S. E. Rep., 886 ; 57 Am. St. Rep., 854) ; *Shannon* v. *Bruner,* 36 Fed. Rep., 147.

It is also adopted by text-writers. Story, Equity, Section 1040*d;* Mechem, Pub. Off., Section 874 ; Greenhood, Pub. Pol., 351 (Rule 297).

The case of *Schloss* v. *Hewlett, supra,* gives this very excellent statement of the reasons for the rule:

"It is very easy to see how great abuses would follow if such transfers were permitted. Not only would there exist a constant temptation to anticipate future earnings, under the stress of present financial pressure, at usurious rates of discount ; but, when completed, one of the strongest incentives to industrious exertion—the expectation of pecuniary reward in the near future—would be gone."

Another well-considered case is that of *National Bank* v. *Fink, supra.* The court of appeals of the fourth judicial circuit certified the following question:

"Is it contrary to public policy in this state for a public officer (he having qualified and been in office) to give a lien upon his unearned official compensation?"

The officer was an assessor, and the court, after citing a formidable list of English and American authorities, says:

"There is no distinction between the assignment of *unearned fees* and the assignment of *unearned salary.* If anything, the reason is stronger for holding such assignments of fees void than for holding a like assignment of salary to be invalid; because a salary is a fixed sum for a given time, and there could be no doubt as to the amount to which the assignee would be entitled; while in the case of fees to be paid by the county or state, the officials would be required to go into a settlement of the question of amount, with many different persons in some instances, which would confuse and embarrass the public business."

In *Bowery Nat. Bank* v. *Wilson,* 122 N. Y., 478 (25 N. E. Rep., 855; 9 L. R. A., 706; 19 Am. St. Rep., 507), the court employs similar reasoning, overruling a case in 50 How. Pr., 143, upon the assignment of the unearned fees of a justice of the peace; and the same rule is applied again in *People* v. *Roberts,* 155 N. Y., 408, 412 (50 N. E. Rep., 53; 41 L. R. A., 228).

Only one case squarely repudiates the doctrine, namely, *State* v. *Hastings,* 15 Wis., 75, 83; but this latter case has been disapproved in many subsequent decisions; among them being *Bangs* v. *Dunn,* 66 Cal., 72 (4 Pac. Rep., 963); *National Bank* v. *Fink,* 86 Tex., 303 (24 S. W. Rep., 256; 40 Am. St. Rep., 833); *State* v. *Williamson,* 118 Mo., 146 (23 S. W. Rep., 1054; 21 L. R. A., 827; 40 Am. St. Rep., 358); *Bowery Nat. Bank* v. *Wilson,* 122 N. Y., 478 (25 N. E. Rep., 855; 9 L. R. A., 706; 19 Am. St. Rep., 507).

The Texas court, in *National Bank* v. *Fink, supra,* thus voices the general disapproval:

"So slight a consideration of the number of cases decided by courts of eminent ability shows that the court in that case (*State* v. *Hastings*), did not give sufficient thought to the question involved to entitle the opinion to weight."

*Brackett* v. *Blake,* 48 Mass. (7 Metc.), 335 (41 Am. Dec., 442—1844); was cited at the hearing as opposing the rule; but upon examination I do not so consider it. In that case the question of public policy, though incidentally mentioned by counsel, was not considered, since the judgment proceeds solely upon the finding that the assignment of salary covered a possibility coupled with an interest, and not a mere naked expectancy.

This case has been distinguished in other subsequent cases, notably, *Bliss* v. *Lawrence,* and *State* v. *Williamson, supra;* and is practically repudiated in *Hadley* v. *Peabody,* 79 Mass. (13 Gray), 200, which holds that the quarterly salary of a public school teacher, holding under an annual salary payable quarterly, can not be reached by trustee proceedings (similar to garnishment in Ohio), prior to the completion of the quarter; upon any theory of proportional earning for time served. The court say:

"It was not a debt and might not become a debt; the contract was entire, and, until completed on the part of the teacher, nothing was due."

There is an expression of doubt by the authors of Pomeroy's Equity (who are California lawyers), in a note to Section 1276, as to the applicability of the English rule to the conditions of this country, and their belief that the American law will not go beyond statutes upon the subject; but the authors cite only a meager list of authorities, and those relate solely to the effect of special United States statutes prohibiting such assignments. No question of public policy was involved in those cases, excepting that the United States statute in question is to all intents

a practical embodiment of the doctrine of public policy under consideration.

In view of the decided weight of authority in favor of this doctrine, of the character and number of eminent authorities upholding it, and of the cogent reasons advanced for its support, I feel constrained to accept and apply it as law for this case, unless, indeed, there exists controlling authority in Ohio to the contrary; or, upon due consideration, I shall be satisfied that a "referee" under our law is not a "public officer" within the scope of the rule.

But in view of defendant's contention that, at the date of the assignment of August, 1898, the referee had already had a number of sittings, and had, therefore, to some extent at least, already *earned* fees, it must be premised that the mere taking of testimony is but the basis and preparation for the duty which the referee is to perform, namely, to consider, decide and report upon the facts thus elicited. The real duty, which is the chief function of the referee, is the *"finding"* of facts and the *"deciding"* upon the law applicable thereto. If, for example, a referee should die after "hearings," but before finding and decision, the work done would avail nothing. His successor must begin *de novo*. It seems but reasonable, therefore, to conclude that the mere preliminary labor of the referee, however onerous, required in order to enable him to discharge the real function of his office, is not the thing for which compensation is provided, apart from its final completion and result.

The case of *Hadley* v. *Peabody, supra,* is an authority on this point; and a still more pertinent authority is *Worthington, In re, supra,* to which I shall have occasion to refer later, together with Ohio authority.

Upon both reason and authority, it must be held that the subject of the assignment of August, 1898, was the *unearned* fees of the referee, and the defendant can derive no benefit from the fact that some labor had already been performed; for, under our statutes, the fees of a referee are to be determined and "allowed" by the appointing

court, and, until so allowed, there exists but an inchoate right.

Coming now to the question whether a referee, under Ohio statutes, is a "public officer" within the rule of public policy herein considered, it is to be noted at the outset that the constitution of Ohio does not employ or define the term *"public* officer." It is in this respect, as Webster characterized the federal Constitution, "an instrument of enumeration rather than of definition."

Section 27, Article II, provides that—

"The election and appointment of *all officers,* * * * shall be made in such manner as may be directed by law."

Under this section our Supreme Court, in *State* v. *Kennon,* 7 Ohio St., 546, 547, hold that:

"Emolument is a usual but not a necessary element to constitute an office. Authority and power relating to the public interest, conferred by statute, and which may be vested in a board or individuals by election or the appointing power of the state, create an office. Whatever less than this may constitute an office," the court holds, "is unnecessary to determine." See also *State* v. *Covington,* 29 Ohio St., 102.

The section quoted, and the decision explaining it, taken in connection with Section 29, Article II, specifying three classes of public servants, namely, "officer," "public agent" and "contractor," suggest a reason for the distinction between a "public officer," properly so-called, who is *invested with some authority and power of the state,* and subject, therefore, to certain responsibilities peculiar to the public service rendered necessary by the interests of the public, and a mere "agent" or "contractor" upon whom no such responsibility rests. Certain requirements relating to personal eligibility to office are also specified in the Constitution, as, that one must be an elector, must not be a duellist, and must take an oath, etc. Sections 4, 5 and 7, Article XV.

Referees, under our code, are clearly adjuncts to the

judicial system of the state, and clothed, to some extent at least, with the powers and duties of the judicial office. Our statutes provide for their appointment by a court, with or without the consent of parties, prescribe their duties, require an official oath, and provide for compensation to be allowed by the court in its discretion. Section 5213, Revised Statutes, provides that a "trial by referees shall be conducted in the same manner as a trial by the court," with power to "summon and enforce the attendance of witnesses administer all necessary oaths in the trial;" "grant adjournments, the same as the court," "find facts," state "conclusions of law" and give "decisions" which may be excepted to and reviewed, and which, unless the reference be merely to report facts, "stand as the decision of the court," and upon which "judgment may be entered thereon in the same manner as if the action had been tried by the court."

The object and purpose of the appointment of referees, as will appear more fully by reference to the multitude of statutes designating the various classes of questions that may be submitted to them, is to relieve the courts, and contribute to the due and speedy administration of justice in the general interest of the public, by doing detail work. This is illustrated in the case at bar, by the referee's appointment to ascertain the identity of numerous stockholders and to proportion and assess their statutory liability.

Our Supreme Court has had occasion to consider this matter somewhat, and its views are instructive in this connection. Thus, in *Lawson* v. *Bissell,* 7 Ohio St., 129, 132, the court say:

"Instead of submitting the case to a jury or the court, the code provides for a third mode of deciding the issues of fact and law; and this is by referees. The referees are substituted for the court and jury; and their province is to decide the facts of the case, if the facts only are submitted; or both the facts and the law of the case, if both are referred. * * *

"These provisions of the code show very clearly that while the trial before the referees is subject to the review and revision of the court ordering the reference, it is a substitute for a trial in court. The finding of facts is, in effect, the special verdict of a jury. The conclusions of law of the referees stand as the law decision of the court; and if not set aside, a judgment follows of course."

*Bell* v. *Crawford,* 25 Ohio St., 402, discusses the effect of *Lawson* v. *Bissell, supra,* on reports of master commissioners, and is valuable as an exposition of the duties and powers of master commissioners and referees. *Cincinnati* v. *Cameron,* 33 Ohio St., 336, 356, holds, *passim,* that:

"The referee is substituted for the court, and the cause proceeds before him as though it was tried in court, and upon submission."   (Citing above cases.)

In the light of the statutory proceedings and of the judicial comments cited, it is difficult to see why a referee, under Ohio laws, is not a "public officer" in a reasonable and proper sense within the general doctrine of public policy under discussion.   There can be no question that a judge of a court of record is a public officer, because the nature of his duties makes him one of the agencies for administering one of the three great powers of government, apportioned by the constitution between the three administrative departments of the state—the legislative, the executive and the judicial.   The "referee," under our law, is, as declared by the Supreme Court, a "substitute for the court and jury," and falls quite within the definition of Mechem, Pub. Off. & Off., Section 1, as follows:

"A public office is the right, authority and duty created and conferred by law, by which for a given period, either fixed by law or enduring at the pleasure of the creating power, an individual is invested with some portion of the sovereign functions of the government, to be exercised by him for the benefit of the public. The individual so invested in a public officer."

Indeed, the referee seems to fall also within the limited

definition of the same author, which discriminates between an office and mere employment or contract, for here is a *"delegation to the individual of some of the sovereign functions of the government to be exercised by him for the benefit of the public."*

The case of *Hathaway, Estate of,* 71 N. Y., 238, has been cited as authority for the opposite view; but upon careful reading it will be found, that, while the court uses expressions that without the context might seem to be of general application, it was in reality dealing with a purely technical question, under a clause of the Constitution of New York prohibiting the justices of the Supreme Court from exercising "any power of appointment to public office." The holding, therefore, that referees, receivers, etc., were not "public officers *within the inhibition of the Constitution,"* and therefore could be appointed by the judges, is purely technical and local, and is not applicable as a countervailing authority under the more general considerations of public policy involved here.

It will not pass without notice that the same court that held "referees" *not* to be *"public officers,"* under a clause of the constitution of New York, is the leading authority for the doctrine under consideration (*Bliss* v. *Lawrence, supra*) ; and that in a much later case (*Worthington, In re, supra*), applied it even to executors, as we shall see.

As an offset to this decision, in any aspect, the ruling of Justice Brewer of the United States Supreme Court, then circuit judge, in *Shannon* v. *Bruner,* 36 Fed. Rep., 147, may be now more particularly referred to as showing that the doctrine under consideration is not so limited. The question was upon the validity of an assignment of the unearned fees of a master in chancery, and the court says:

"Now, can an officer make an assignment 'in advance of his fees or salary? The law is very clear that he can not. Public policy has affirmed the necessity of securing to every public officer, when earned, his fees or salary, unhindered by any present legal attack or any previous voluntary assignment. There are many cases, both in England and this

country, affirming the necessity of upholding such public policy."

After citing *Bliss* v. *Lawrence, supra,* and discussing *State* v. *Hastings, supra,* in opposition, he continues:

"But the general voice of authority, both across the water and here, is, that no voluntary assignment can be sustained by a public officer of fees or salary yet to be earned."

It will be sufficiently obvious, that for the practical purposes of this case a master and a referee are substantially interchangeable quantities, although the duties and powers of the master are usually of a somewhat more limited nature; so that the views of Justice Brewer apply with equal if not greater force to referees.

Counsel for the defense, by way of the *reductio ad absurdum,* cite the case of notaries public, who they say are, in a sense, "judicial officers," yet not *"public officers"* under our constitution.   But a notary public is, in fact, one of the few thus expressly recognized in that instrument.   Section 4, Article II, refers to notaries public as "holding *office* under the authority of the state," and therefore are "public officers" in the sense of the argument used.

We pass now to the consideration of such Ohio cases as bear more or less directly upon the questions at issue.

The case of *Newark* v. *Funk,* 15 Ohio St., 462, holds that the salaries of officers of incorporated cities, due and unpaid, may be subjected by judgment creditors to payment of their judgments under Section 458 of the code (Section 5464, Revised Statutes).

It appears to have been contended that it was "against public policy to permit salaries and pay of their officers and public agents to be so garnisheed."

The court holds otherwise, but says, page 464:

"We do not say, or suppose, that a salary which is not yet earned, or for the payment of which the proper period has not yet arrived, can be so garnisheed, or attached. It must be a subsisting claim, due or to become due, and for the ultimate payment of which the obligation to pay is

fixed, without reference to future services or consideration."

This obviously excludes fees yet to be "allowed," the payment of which depends not only upon the completion of the service, but upon the allowance by a court thereafter.

*Porter* v. *Dunlap,* 17 Ohio St., 591, was cited by the defense in opposition to the general doctrine. A public school teacher, under annual salary, payable in quarterly installments, assigned his quarter's salary, in advance, to the township treasurer, authorizing him to retain it out of the money to come into his hands for the quarter's service, and subsequently, after receiving the order on the treasurer at the conclusion of the quarter for the salary then due, transferred the order to another, who had no notice of the former transfer. The court sustained the claim of the treasurer as a prior equity coupled with possession, treating the agreement of the teacher allowing the treasurer to retain the money out of funds which must eventually come through him, as collateral to the assignment, and creating an estoppel against the subsequent assignee in virtue of the acts of the assignor.

It does not appear that the doctrine of public policy, under present consideration, was invoked in the case, or was in any way referred to. The prior assignment was attacked upon grounds of public policy, indeed, but of an entirely different character.

But, under the views and authorities before cited, it may well be that neither court nor counsel regarded a school teacher as a "public officer" in any sense, under the doctrines here discussed.

An almost precisely similar case will be found in *Johnson* v. *Pace,* 78 Ill., 143, in which the action of the court was similar, and in the opinion there is this hint as to the reason:

"Nor do we discover here any such violation of duty or improper practice, as school officers, as is claimed by appellants, which should deny to Holmes (the prior assignee) the benefit of this money."

But the case contains no suggestion otherwise that the assignment was questioned on such grounds.

*Carran* v. *Little,* 40 Ohio St., 397, decided by the Supreme Court commission, presents a case of an assignment by a city solicitor of a quarter's salary in advance; but there is in it no hint or suggestion that the question of public policy was raised or considered. The suit turned upon the question of liability of the endorser of the order, and involved no question pertinent to the present consideration.

The case of *Overturf* v. *Gerlach,* 62 Ohio St., 127 (56 N. E. Rep., 653; 78 Am. St. Rep., 704), is important in its recognition of the public impolicy of permitting the unearned fees of a public officer to be sequestered.

The suit was against an executor under Section 5464, Revised Statutes. The court distinguishes the case of *Newark* v. *Funk,* 15 Ohio St., 462, and draws special attention, as I have done here, to the express limitation embodied in it.

The court further say, page 131:

"Whilst the embarrassment that might affect the public service in the attachment of the salary of a public officer, was not regarded, in the case above cited, of such a grave character, as, on grounds of public policy, to forbid its adoption by a creditor, yet its impolicy in the case of administrators, for the reasons stated, is more apparent than in the case of public officers, and has not been sustained by any court."

In discussing the nature of the executor's compensation, the court say, page 130:

"Overturf, * * * may not be entitled to the compensation and commissions provided by law at his final settlement. This will depend upon the judgment and allowance of the probate court. By reason of maladministration he may be entitled to nothing, and nothing may be allowed him. Hence, *until* one or the other of the two *estates,* * * * has been settled, or some allowance has been made him

by the probate court, it can not be said that anything is due him therefor."

The syllabus of the case is as follows:

"Until allowed by the probate court, the compensation and commissions of an administrator or executor * * * can not be attached, or, by any similar process, appropriated to the payment of his claim by a creditor of such executor."

*Newark* v. *Funk, supra,* forms an instructive supplement to that of *Worthington, In re, supra,* in which an executor assigned. his commissions, in advance, and was subsequently removed for mental incapacity and died—all prior to his filing of final account and allowance of fees and commissions by the court.

The opinion of the court brings so fully and clearly into review underlying reasons which seem to me applicable to the case at bar, as to justify liberal quotation.

Says the court:

"It may be conceded that the assignment of the commissions was made for a good consideration and that the removed executor had actively participated for many years in the management and administration of the estate, and that his representatives were therefore entitled to some consideration upon the final allowance of commissions by the surrogate. The difficulty in the way of appellant is of another kind. Until ascertained and liquidated at the times and in the manner authorized by law, the commissions are not subject to the executor's disposal, but the right to them is inchoate, and, upon grounds of public policy, unassignable. There is no fundamental distinction in this respect between public and private trusts, where the statute fixes the compensation, and prescribes that it shall not become due and payable until the services have been rendered, or at stated periods during the term of service. It is well settled that a public officer can not, during his official term, and before his salary or fees become due and payable, make a valid assignment of such salary or fees (*Bliss* v. *Lawrence,* 58 N. Y., 442; *Bowery Nat. Bank* v.

*Wilson*, 122 N. Y., 478). * * * If the emoluments of the office might be separated from it and transferred to another, it would leave the duties of the office as a barren charge to be borne by the incumbent. It is evident that transfers of this kind would not tend to promote activity and care in the discharge of official obligations. The same considerations forbid the recognition of an assignment, by an executor, of his commissions in advance of the time prescribed by law for their adjustment and payment. When the hope of compensation is gone, a strong incentive to diligence and zeal is wanting, and the temptation to be content with a lax and perfunctory administration of the trust becomes more persuasive."

When it is considered that the functions of a referee, under our statutes, are not simply of an administrative character, as are those of an executor, but involve the exercise of judicial powers in hearing and rendering decisions upon both the law and the facts, which in some cases stand as and for the decisions of the court itself, it must be admitted that the reasons given by the New York court of appeals apply with even stronger force to referees. The question arising upon the application of the doctrine under discussion is not one to be determined upon a mere technical definition of the term "public officer," such as might be necessary under a power of appointment embodied in a state constitution, but is, whether the duties to be performed in relation to the governmental powers of the state and for the public benefit, are such as establish a proper basis for the application of a rule of public policy thoroughly settled by the great weight of authority.

Upon careful consideration of all authorities cited, and many others, I am clearly of opinion that the rule of public policy holding void the assignment of the unearned fees of a public officer is a most salutary one and should be upheld and enforced in cases like the present, where duties of a public nature are to be performed, compensation for which depends upon allowance by a court.

In no one of the Ohio cases, so far as I have been able to ascertain, has the doctrine of public policy herein dis-

cussed been brought distinctly before the court as the basis of decision. The *dicta* in *Newark* v. *Funk, supra,* refer to salaries already earned and due; as to which no question has been raised. The case of *Porter* v. *Dunlap, supra,* may be distinguished upon grounds already indicated; but even if it be taken as fixing a point of limitation beyond which the application of the rule of public policy should not be carried, still the case at bar falls clearly within and not without such limitation. The case of *Carran* v. *Little, supra,* was not one of conflicting claimants, and was controlled by considerations so diverse from those involved here, it can hardly be regarded as pertinent in any degree.

Therefore I do not find any objection, either in the letter or spirit of Ohio decisions, to the application of the doctrine of public policy upheld by the cited authorities to facts such as presented by the case at bar.

A further question, suggested during the argument, seems to me upon further consideration to be also decisive. The prior assignment was not given upon a moving consideration applicable thereto, but as an additional and collateral security for a pre-existing debt, namely, a note given by Kumler in 1893, endorsed by Robertson, being a wholly different transaction, having no connection with the appointment or services of Kumler as referee.

It is well settled that, in a contest between successive equities, the rule *"prior in tempore prior est in jure"* can be invoked where equities are equal, but not otherwise; and it is equally well settled that one who takes an assignment for a pre-existent debt, is not a *bona fide* purchaser and en-entitled to protection against one who pays actual and full value upon the faith and credit of the thing assigned—one "who has actually parted with his property upon the credit of the estate." 4 Paige, 215.

These are familiar doctrines of equity, applicable wherever kindred circumstances arise.

As applied to circumstances closely analogous to those of the case at bar, they will be found very fully discussed in the case of *The Elmbank,* 72 Fed. Rep., 610, 617 *et seq.,* citing many state decisions illustrating the general principle.

The case covers also the question of notice as it arises here, and is conclusive.

I hold, therefore, as between the two assignments under consideration that, upon both or either of the grounds stated, the assignment given to Burch, the plaintiff, must prevail, and judgment is rendered accordingly.

*Burch & Johnson,* for plaintiff.
*Scott Bonham,* for defendant.